STANLEY MAJKA, Appellant, *v.* GEORGE A. HASKELL et al., Defendants, and CITY OF BUFFALO, Respondent.

Argued May 19, 1950; decided July 11, 1950.

*Edward B. Horning* for appellant.  I.  The trial court correctly left the negligence issue to the jury.  (*Maxmilian* v. *Mayor of City of N. Y.*, 62 N. Y. 160; *Wilcox* v. *City of Rochester*, 190 N. Y. 137; *Missano* v. *Mayor of City of N. Y.*, 160 N. Y. 123; *Whittaker* v. *Village of Franklinville*, 265 N. Y. 11; *Annino* v. *City of Utica*, 276 N. Y. 192; *Carr* v. *City of New York*, 281 N. Y. 469; *Campbell* v. *City of New York*, 285 N. Y. 529; *Howarth* v. *City of New York*, 294 N. Y. 721; *Bernardine* v. *City of New York*, 294 N. Y. 361; *Loughran* v. *City of New York*, 298 N. Y. 320.)  II.  The issue of causation was for the jury.  (*O'Neill* v. *City of Port Jervis*, 253 N. Y. 423; *Storey* v. *Mayor of City of N. Y.*, 29 App. Div. 316; *Diener* v. *Carmen Cab Corp.*, 264 N. Y. 407; *Peck* v. *Independent Automobile Forwarding Corp.*, 280

N. Y. 728; *Mullen* v. *Fayette,* 300 N. Y. 501.) III. The issues of negligence on the part of plaintiff and defendant Haskell were for the jury. (*Tedla* v. *Ellman,* 280 N. Y. 124.)

*Fred C. Maloney, Corporation Counsel* (*Bart J. Shanahan* of counsel), for respondent. I. No actionable negligence was proved against the City of Buffalo. (*Swift* v. *City of New York,* 270 N. Y. 162; *Johnson* v. *City of New York,* 208 N. Y. 77; *Murrain* v. *Wilson Line, Inc.,* 270 App. Div. 372, 296 N. Y. 845; *Steitz* v. *City of Beacon,* 295 N. Y. 51; *Green* v. *City of Mechanicville,* 269 N. Y. 117; *Ferrier* v. *City of White Plains,* 262 App. Div. 94.) II. The proximate cause of plaintiff's injuries was not due to any act or omission on the part of defendant municipality. (*Tedla* v. *Ellman,* 280 N. Y. 124; *Gaines* v. *City of New York,* 215 N. Y. 533; *Albertson* v. *Ansbacher,* 102 Misc. 527; *Green* v. *City of Mechanicville,* 269 N. Y. 117; *Rider* v. *Syracuse R. T. Ry. Co.,* 171 N. Y. 139; *Laidlaw* v. *Sage,* 158 N. Y. 73; *Leeds* v. *New York Tel. Co.,* 178 N. Y. 118.)

LEWIS, J. South Park Avenue in the city of Buffalo is a main east-west thoroughfare which, by means of a viaduct, spans the parallel rights of way of the New York Central and the Erie railroads. The total length of that viaduct including ramps leading up from either end is between 2,000 and 2,500 feet. In the center of the ramps and viaduct is a paved roadway 42 feet wide designed for vehicular traffic. To accommodate pedestrian traffic there is on either side a paved sidewalk raised 6 inches above the surface of the center roadway and separated from it by curbing. At the point where the viaduct is carried over the New York Central right of way by steel bridgework 300 feet in length, the pedestrian lane on either side is separated from the center roadway not only by curbing but also by steel bridgework which serves to protect pedestrians from vehicular traffic moving along the center roadway.

In the month of May, 1945, there came a time when inspection of the South Park Avenue viaduct by representatives of the defendant city revealed that, at a point where the New York Central tracks pass under the viaduct, the under surface of the sidewalk flooring had become so disintegrated — due to fumes and gases emitted by railroad engines — as to be unsafe. The unsafe condition thus discovered caused the defendant city

on May 21, 1945, to close and barricade that segment of the
viaduct sidewalks — 300 feet in length — which spanned the
New York Central tracks. Although barricades then placed at
each end of the closed segment carried a sign upon which was
printed " Bridge Closed ", there was no barricade nor was
there warning of any kind at either the westerly or easterly
end of the viaduct to give notice to pedestrians or to vehicular
traffic that at a point — far removed from either end — a seg-
ment of the sidewalk was closed.

On the night of June 2, 1945 — twelve days after the pedes-
trian lanes were closed — the plaintiff, a man fifty-two years
of age, was returning to his home walking westerly along the
sidewalk on the north side of the viaduct. When he had
walked a distance of 1,500 feet along that pedestrian lane he
came to the barricade erected 500 feet east of the west end of
the structure. There is evidence that, although the plaintiff
had recently crossed the bridge in a bus, he did not know the
sidewalk was closed at any point until he reached the barricade
which blocked the lane in which he was walking. There is also
evidence that at that time and place rain was falling and visi-
bility was dimmed by fog or by smoke from a locomotive passing
under the bridge. Being unable to proceed further homeward
on the sidewalk by which he had reached that point on the
viaduct, he turned from the sidewalk into the center roadway
where vehicular traffic was passing and where he continued
westerly along the north side of that roadway. While pursuing
that course he was struck by a westbound automobile — owned
by the defendant Oberg and then driven by the defendant
Haskell — and sustained the personal injuries which gave rise
to this action.

At Trial Term a jury's verdict awarded damages to the plain-
tiff against the city, and denied a cause of action by the plaintiff
against the individual defendants. At the Appellate Division
the judgment entered at Trial Term was reversed on the law
and facts and the complaint was dismissed.

Even before the State's waiver of sovereign immunity by
section 8 of the Court of Claims Act (L. 1939, ch. 860) had
rendered the defendant city liable, as are individuals and private
corporations, for wrongs proven to have been done by its officers
or employees, " *   *   *   the city owed to the public the corpo-

rate duty of maintaining the street in a condition reasonably safe for the ordinary uses of travel '' (*Green* v. *City of Mechanicville,* 269 N. Y. 117, 122–123). Under the Charter of the City of Buffalo (Local Laws, 1927, No. 4 [published in Local Laws, 1932, p. 21], art. 10, § 178) the city is charged with the '' * * * construction, maintenance, repair and alteration of bridges, viaducts and subways * * *.'' Accordingly, in the event the city fails in such duty it is '' * * * liable for damages to persons, without fault on their part, receiving injuries upon its streets ''. (*Pomfrey* v. *Village of Saratoga Springs,* 104 N. Y. 459, 465; *Missano* v. *Mayor of City of N. Y.,* 160 N. Y. 123, 129.) In the case last cited above this court considered the liability of the City of New York for the death of a child alleged to have been caused by negligence of city employees in the street cleaning department. In ruling that the city was liable for the fault of its street maintenance employees the court took occasion to say (p. 129) — '' It is clear upon principle and authority that the city of New York, in the ordinary and usual care of its streets, both as to repairs and cleanliness, is acting in the discharge of a special power granted to it by the legislature, in the exercise of which it is a legal individual, as distinguished from its governmental functions when it acts as a sovereign.'' (See, also, 4 Dillon on Municipal Corporations [5th ed.], § 1708; 7 McQuillin on Municipal Corporations [2d ed.], § 2902, p. 15.)

True it is, as the city now asserts, that when its agents discovered that the sidewalk flooring at a point on the South Park Avenue viaduct had become unsafe, the city had not only the right but the duty to close that unsafe portion to pedestrian traffic as a means temporarily to abate the risk there existing. However, circumstances peculiar to this record pose the question whether the manner in which the city chose to abate one risk did not create another. We consider the question thus posed in the light of the rule which required the city to accomplish the closing of the sidewalk lanes in such a manner as to avoid risk to pedestrians reasonably to be foreseen. (*McCrink* v. *City of New York,* 296 N. Y. 99, 106; *Palsgraf* v. *Long Island R. R. Co.,* 248 N. Y. 339, 344.)

At the time of the accident here involved, although the sidewalk on each side of the viaduct had been closed for twelve

days — during all of which time the center roadway remained open for traffic — no warning of the closing was given to the plaintiff until he had walked a distance of 1,500 feet along the sidewalk provided for his use and then came to the barricade on which was posted the printed sign " Bridge Closed ". No guarded passageway was provided along the north side of the center roadway through which pedestrians could circumvent the closed segment; nor was egress from the *cul-de-sac* into which the plaintiff had been led afforded by the sidewalk along the opposite or south side of the viaduct to which he might have crossed when traffic on the center roadway permitted. That sidewalk on the south side, as we have seen, had also been closed and barricaded for the same reason.

It thus came about that two courses were available to the plaintiff: (1) to retrace his steps back to the first exit from the north sidewalk lane and there map anew his homeward course by such a route as would enable him to avoid the viaduct, or (2) to walk around the end of the barricade and, by proceeding along the north edge of the center roadway, thus by-pass the closed section of the pedestrian lane. The plaintiff chose the shorter, quicker course along the center roadway — indeed the *only* way at that point which the city had left open *on the viaduct* for traffic by vehicles or pedestrians.

In view of the conceded fact that both sidewalks for pedestrians had been closed at a point far removed from either end of the viaduct, without warning of such closing until the barricades were reached, and it appearing that the city had left open at that point the center roadway as the only lane on the viaduct for both vehicular and pedestrian traffic, we think it became a question of fact for the jury whether there was thus created by the city a risk — reasonably to be foreseen — that pedestrians would choose, as did the plaintiff, to turn at the barricade into the open way afforded by the center roadway and thus find their way around the closed segment of the sidewalk, rather than to retrace their steps and of necessity reach their destination by a circuitous course which would avoid the viaduct entirely.

At Trial Term that question, and the added question whether, in the circumstances disclosed by the evidence, plaintiff's conduct amounted to contributory negligence, were submitted to

the jury by the Trial Justice after a charge which we regard as clear and adequate. In our view the verdict returned by the jury did not result from error of law.

Accordingly, the judgments should be reversed and a new trial granted, with costs to abide the event.

LOUGHRAN, Ch. J., CONWAY, DESMOND, DYE, FULD and FROESSEL, JJ., concur.

Judgment accordingly.