[No. 33819. Department One. September 12, 1957.]

ROBERT T. DEYOUNG, *Individually and as Guardian ad Litem, Appellant*, v. ROBERT F. CAMPBELL *et al., Respondents.*
ROBERT T. DEYOUNG, *Individually and as Guardian ad Litem, Respondent*, v. THE CITY OF SEATTLE, *Appellant.*
ROBERT F. CAMPBELL *et al., Respondents*, v. THE CITY OF SEATTLE, *Appellant.*[1]

[1]Reported in 315 P. (2d) 629.

*A. C. Van Soelen, John A. Logan,* and *Frank W. Draper,* for appellant.

*Powell, Johnson & Livengood,* for respondent DeYoung.

*Kahin, Carmody & Horswill,* for respondents Campbell.

WEAVER, J.—The city of Seattle appeals from two money judgments against it; the first, in favor of Robert T. De-Young, individually and as guardian of his two minor children; the second, in favor of Robert F. Campbell and wife. In Mr. DeYoung's action against the Campbells, the same jury returned a verdict for the defendants. These three cases were consolidated for trial and review in this court. Mr. DeYoung admits that he is not aggrieved unless this court reverses the judgments against the city or grants a new trial in the companion appeal wherein Mr. DeYoung is respondent.

The city assigns error to the court's (1) refusal to sustain its challenge to the legal sufficiency of the evidence; (2) denial of its motion for judgment notwithstanding the jury verdicts or for a new trial; and (3) the exclusion of its exhibit No. 60.

■ We are required to view the evidence most favorable to the successful parties, and all such material evidence must be accepted as true. The jury verdicts will not be disturbed, unless we can say, as a matter of law, that there is neither evidence nor reasonable inference therefrom to sustain the verdicts.

With this in mind, we believe the jury was entitled to find the facts to be as follows:

The University bridge, one of the main conduits of vehicular traffic from the University district to the business section of Seattle, is a bascule bridge. The center portion, with which we are concerned, is 42 feet wide and is decked, for approximately 270 feet, with a steel web-shaped matting known as Irving grating. It accommodates four lanes of traffic, two north and two south. Each lane is approximately 10½ feet wide.

In 1933, four street car rails were installed on the bridge. Seattle discontinued the use of street cars across the bridge in 1940. In 1946 or 1947, the two outside rails were removed. We are concerned with only one of the remaining rails—the east rail of the former southbound track.

The slightly rounded surface of the rail, two and one half inches in width, projected one quarter of an inch above the plane of the Irving grating that forms the deck of the bridge. On the west side of the rail was a flange groove one and three quarter inches wide. It appears, from a photograph in evidence, that there was also a groove on the east side of the rail. Construction plans disclose that this groove was one and one half inches wide.

The rail was two feet six inches west of the center line of the bridge. The relation of the position of the rail to the southbound vehicular traffic in the inside lane is described by an engineer of the city as follows:

"Q. So that a car that is running down the center of the lane would in all probability have *its left wheels on the streetcar track that is on the inside*. That is a matter of physical fact. That is accurate, is that correct? A. *If you were hanging right into the center of the lane*, but there is plenty of distance there; you wouldn't have to. Q. I say, assuming you are travelling in the center. A. Assuming the

automobile was centered directly in the center of the lane itself, then *that would be true*." (Italics ours.)

This testimony is substantiated by the many photographs which are in evidence.

There is competent expert testimony that the coefficient of friction on the steel matting, when wet, is comparable to that of concrete pavement when wet; and that the coefficient of friction on the steel rail, when wet, is comparable to wet, packed snow.

There is also expert testimony (some of it conflicting) that the difference in the coefficient of friction between the rail and the steel matting, together with the grooves on each side of the rail and its projection above the deck of the bridge, would cause an automobile striking the rail to wobble and sway.

The city engineer testified that he had received some letters, during the period between 1946 and 1953, notifying him that the rails on the University bridge were a traffic hazard, particularly in wet weather. He also testified that an authorized letter, written July 8, 1954, by a member of his department, stated that "these rails are a traffic hazard, as they are slippery in wet weather."

On the day of the accident, it was raining and the surface of the bridge was wet. Mrs. Robert F. Campbell, one of the respondents, approached the University bridge in her car, traveling in the southbound outside lane of traffic. She moved to the southbound inside lane, which we have heretofore described in some detail. Approximately half way across the bridge, she passed a car driven by Mrs. Alva Soeby. Mrs. Soeby was driving in the southbound outside lane at twenty to twenty-five miles an hour. Mrs. Campbell's car was in a normal position in the lane and was traveling parallel to the car driven by Mrs. Soeby. Mrs. Soeby and a passenger in her car testified that Mrs. Campbell's car, as it came abreast, "wiggled," "wobbled," and "rocked"; it tipped from one side to the other, although it remained upright. It was out of control. The back end of Mrs. Campbell's car then veered into the outside southbound lane of traffic and would have been struck by Mrs.

Soeby's car had it (Mrs. Campbell's car) not careened across the bridge into the face of oncoming northbound traffic. It struck the concrete portion of the bridge fifty-eight feet south of the south edge of the Irving grating.

Mr. DeYoung, with his two minor children, was driving north, nearing the south approach of the University bridge. Mr. DeYoung testified that Mrs. Campbell's car was traveling twenty-five to thirty miles per hour as it shot in front of him. At the same time the Campbell car hit the concrete bulkhead, Mr. DeYoung's car smashed into the side of it. It was a simultaneous collision.

Absent the street car rail, there were no holes, bumps, obstructions, defects, or hazards on the bridge that would cause Mrs. Campbell's car to wobble or rock. The car was in good mechanical condition. The tires and brakes were good; the car had no tendency to skid.

Prior to the accident, Mrs. Campbell was in good health; she was energetic; she was not subject to fainting spells; she had good vision without glasses. As a result of her injuries, she had no recollection of the events concerning the accident.

The problems involved and the questions presented are brought into sharper focus if we only consider the two-and-one-half-inch ribbon of steel, projecting a quarter of an inch above the plane of the bridge deck and extending its entire length. The rail had not been used as part of a street car track for fourteen years and served no useful purpose. Although its mere existence was not made unlawful, solely by continued nonuser, it is a non sequitur to say that the city was not negligent, as a matter of law, when it permitted the rail to remain in the deck of the bridge. Under the facts as the jury was entitled to view them, whether the bridge was unsafe for ordinary travel, by reason of the rail, and whether the city was negligent in not removing it, became questions for the jury to consider under proper instructions. *Saylor v. Montesano*, 11 Wash. 328, 334, 39 Pac. 653 (1895); *Cutcher v. Detroit*, 139 Mich. 186, 102 N. W. 629 (1905); *contra, Green v. Mechanicville*, 269 N. Y. 117, 199 N. E. 26, 102 A. L. R. 673 (1935).

The city is not an insurer against accident nor a guarantor of the safety of those using the bridge. It is, however, obligated to exercise ordinary care to maintain the bridge in a reasonably safe condition for people using it in a proper manner and exercising due care for their own safety. *Owens v. Seattle*, 49 Wn. (2d) 187, 191, 299 P. (2d) 560 (1956), and cases cited; *Fritch v. King County*, 4 Wn. (2d) 87, 102 P. (2d) 249 (1940), and cases cited. This court said, in the *Owens* case, *supra*,

"Where this duty is not fulfilled, the municipality is negligent and may be held liable for damages proximately caused by such negligence. *Bradshaw v. Seattle*, 43 Wn. (2d) 766, 264 P. (2d) 265."

Before it can be said that the city is liable in damages, because of its negligence (if the jury finds it negligent), the jury must find that the negligence was the proximate cause of the accident. This the jury found by special interrogatory.

The city urges that there is no direct or circumstantial evidence, or reasonable inference therefrom, that would justify a conclusion that the left wheels of Mrs. Campbell's car came in contact with the street car rail and skidded because of it; that such a conclusion is based on supposition and conjecture.

None of the witnesses testified that the wheels of Mrs. Campbell's car came in contact with the rail. Because of her mental and physical condition, she was unable to testify to this fact.

Circumstantial evidence is proof of certain facts and circumstances, from which may be inferred other and connected facts that usually and reasonably follow according to the common experience of mankind. It is unquestioned that proximate cause may be adduced as an inference from other facts proven. *Wilson v. Northern Pac. R. Co.*, 44 Wn. (2d) 122, 265 P. (2d) 815 (1954).

The evidence favorable to plaintiff, if believed by the jury, reasonably excludes the possibility that the accident was the result of any cause other than contact with the street car rail. We believe that the facts are of such a

nature and so related to each other that contact with the street car rail is the only conclusion that can fairly or reasonably be drawn therefrom. *Berkovitch v. Luketa*, 49 Wn. (2d) 433, 434, 302 P. (2d) 211 (1956).

It was not error to submit the cases to the jury.

The trial court refused to admit in evidence the city's exhibit No. 60 for identification. The exhibit is made up of nineteen large sheets, purporting to be photostatic reproductions of thirty-eight pages selected from four log books kept by the bridge tenders of the University bridge. It covers the bridge tenders' reports for approximately fifty-seven days between October 27, 1951, and October 29, 1954.

When the court inquired the purpose of the exhibit, counsel replied, "They are offered to prove the number of accidents on the bridge. Later in argument, counsel expanded the purpose of the offered exhibit as evidence of the location of other accidents on the bridge. He stated, "I rely solely upon the uniform business records" act to establish the admissibility of the exhibit.

Assuming, without deciding, that the operation of a bridge qualifies as a "business" under the uniform business records as evidence act (RCW 5.45), and assuming that the proffered exhibit was properly identified, we still cannot say that the court erred by excluding it.

RCW 5.45.020, which makes business records admissible in evidence under certain conditions, provides that such records are admissible

". . . if, in the opinion of the court, the sources of information, method and time of preparation were such as to justify its admission."

 The trial court held that the exhibit did not meet the test of reliability. In *Cantrill v. American Mail Line, Ltd.*, 42 Wn. (2d) 590, 608, 257 P. (2d) 179 (1953), this court said:

"In this state, the ruling of the trial judge in admitting or excluding such records [under the uniform business records as evidence act] is given much weight and will not be reversed unless there has been a manifest abuse of discretion. [Citing cases.]"

18

See, also, *Young v. Liddington*, 50 Wn. (2d) 78, 309 P. (2d) 761 (1957).

After a careful review of the record, we are not prepared to say that the trial court abused its discretion.

It is not necessary for us to discuss the appeal of Mr. DeYoung.

The judgments are affirmed.

HILL, C. J., MALLERY, ROSELLINI, and OTT, JJ., concur.

